**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Chandler Gas and Store Incorporated, et al., | No. CV-23-00400-PHX-KML |
| Plaintiffs, | **ORDER** |
| v. | |
| Treasure Franchise Company LLC, et al., | |
| Defendants. | |

The upcoming trial between plaintiffs (collectively "Chandler Gas") and defendants (collectively "Marathon") centers on alleged point-of-sale machine operating system malfunctions at Chandler Gas. Both sides filed expert-exclusion motions: Chandler Gas moves to exclude the opinions of John Umbeck and Marathon moves to exclude the opinions of Max McDevitt. (Docs. 186; 192.) The motion to exclude Umbeck's testimony is granted in part and denied in part. The motion to exclude McDevitt's testimony is denied.

**I.     Legal Standard**

   **a.  *Daubert* Motions**

Federal Rule of Evidence 702 governs the admission of expert testimony. The rule permits a qualified expert to offer opinions if the proponent shows "it is more likely than not" that the testimony rests on sufficient facts or data, reliable methods, and a reliable application of those methods to the case and the expert's scientific, technical, or other specialized knowledge will help the trier of fact. *See* Fed. R. Evid. 702. The proponent

bears the burden of establishing admissibility. *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).

Rule 702 embraces a broad understanding of expert qualifications. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004). Relevant professional experience may establish the "minimal foundation" required. *Id.* at 1015–16. "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) (internal citation omitted). That latitude "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.*

The Rule 702 inquiry is flexible and focuses on principles and methodology, not the conclusions drawn from them. *Id.* at 594–95. The inquiry has two components: relevance and reliability. *Id.* at 589–92. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* at 587 (quoting Fed. R. Evid. 401) (simplified). This relevance standard is liberal. *Id.*

The reliability threshold is likewise broad. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Courts must "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

The court has broad discretion in assessing reliability and deciding how to evaluate it. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). Considerations may include whether the theory or technique can be tested, whether it has been subject to peer review, its known or potential rate of error, and its general acceptance in the relevant field. *Daubert*, 509 U.S. at 593–94. These factors are not exhaustive, nor must they apply in every case. *Hankey*, 203 F.3d at 1168. When reliability depends primarily on an

expert's experience, these factors may carry less weight. *Id.* at 1169 ("[T]he *Daubert* factors . . . simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it."). Ultimately, the court must determine whether the proffered testimony is grounded in an accepted body of knowledge and supported by reliable reasoning rather than speculation.

## II. Chandler Gas's Motion to Exclude Umbeck

### a. Umbeck's Opinions

Umbeck is a professor of economics at Purdue University who has more than 40 years of experience researching the petroleum industry and the marketing of petroleum products. (Doc. 186-1 at 6.) Umbeck explains he was retained by Marathon to determine whether Chandler Gas was profitable and the amount of damages the business might have incurred due to the alleged point-of-sale problems. (Doc. 186-1 at 7.) Based on his review of "all of the available information" (Doc. 186-1 at 34), Umbeck drew eight "conclusions," which the court will treat as the opinions Umbeck hopes to offer at trial:

1. The Chandler station was profitable when operated by Prima Investments.
2. The Chandler station was profitable when operated by the McCullochs.
3. The financial data shows no evidence of any significant financial harm to the station during the time of the alleged failure of the operating system.
4. The actual computer problems, using Verifone data, shows no evidence of any significant loss of gasoline sales.
5. The customer reviews show no evidence of customers being upset about any inconvenience caused by the computer problems.
6. Based on opinions 3–5, the alleged failure of the operating system would have no significant negative impact on the expected future revenues or the market value of the business when sold.
7. The business experienced a significant decrease in the volume of fuel it sold, compared to the sales when operated by Prima. However, these lost fuel sales

were caused by the new retail pricing policy implemented by the McCullochs and not the alleged problems with the operating system.

8. Any loss in value the business might have incurred during this time period was caused by the plaintiffs.

(Doc. 186-1 at 9.) Chandler Gas appears to seek the exclusion of all of Umbeck's testimony because he "is not qualified, his opinions are not reliable, and they would not be helpful to the jury." (Doc. 186 at 5.) But Chandler Gas focuses on excluding what it identifies as Umbeck's "causation opinions" involving what damage was caused by the operating system failures. (Doc. 186 at 5, 10–21.) Additionally, Chandler Gas seeks to fully exclude Umbeck's rebuttal report on the basis it merely rehashes his original expert report rather than contradicting or rebutting McDevitt's report. (Doc. 186 at 20.)

### b. Analysis

Umbeck holds a doctorate in economics, has taught in that field for more than four decades, and has an extensive background in petroleum industry economics and marketing. (Doc. 186-1 at 6.) He has published scholarship in economics, consulted with industry participants, and previously testified as an expert in matters involving petroleum marketing and profitability. (Doc. 186-1 at 6.) These qualifications are sufficient to establish the "minimal foundation" required under Rule 702 for testimony regarding business profitability, pricing decisions, market forces, and other related economic issues affecting fuel sales. *See Hangarter*, 373 F.3d at 1015–16.

### Opinions 1 and 2 Regarding Profitability

Chandler Gas argues Umbeck's first two opinions should be excluded because they are not relevant. (Doc. 186 at 8.) Those opinions address the profitability of the station under its prior owner (Prima) and then once Chandler Gas took over. Chandler Gas claims hundreds of thousands of dollars in damages based on alleged lost sales volume. (Doc. 205 at 10.) Umbeck's opinion that the station was profitable during the relevant period and that observed volume declines are more consistent with pricing decisions than computer outages bears directly on causation and damages.

Evidence of profitability is relevant because it provides economic context against which the jury can assess the plausibility and magnitude of Chandler Gas's claimed losses. A central issue to this case is whether any alleged operating system outages actually caused a measurable financial impact. Evidence showing the operations before Chandler Gas assumed control and that the business remained profitable during the relevant period will assist the jury in understanding the evidence or determining a fact in issue. *Daubert*, 509 U.S. at 591; *see also Hangarter*, 373 F.3d at 1017. And although profitability alone does not disprove damages, it is probative of whether the alleged operating system issues caused significant economic harm, and the weight to be given to that evidence is a matter for the jury, not a basis for exclusion. *See Primiano*, 598 F.3d 558, 564 (9th Cir. 2010) (holding issues of weight and credibility are for cross-examination and not exclusion). This testimony provides relevant background and probative evidence that may assist the jury in evaluating the scale of Chandler Gas's claimed damages.

Accordingly, Umbeck's Opinions 1 and 2 on profitability are relevant and admissible.

**Opinions 3 and 4 Regarding Operating System Failures**

Umbeck concludes the alleged failures of the operating system did not cause significant financial harm or loss of gasoline sales. (Doc. 186-1 at 9.) Chandler Gas argues Umbeck failed "to consider probative information regarding the frequency and severity of Operating System failure/outages, rendering his opinions unreliable." (Doc. 186 at 10–11.) Chandler Gas also contends Umbeck's purported methodology is unreliable because the Verifone logs are incomplete, the fifteen-minute threshold Umbeck used is arbitrary, and Umbeck is not qualified to interpret technical outage data. (Doc. 186 at 12.)

To determine the impact the operating system had on sales, Umbeck looked exclusively to "a Verifone log" that included 75 problems each assigned a unique case number. (Doc. 186-1 at 16.) He does not explain why he only looked at Verifone logs and

did not consider other sources that could have demonstrated system outages. (Doc. 186-3 at 15.) The majority of Verifone problems were, according to Umbeck, "resolved in 5 minutes or less." (Doc. 186-1 at 16.) Apparently based solely on his personal experience with computer problems, Umbeck contends customers do not leave a station and go elsewhere if a problem can be resolved within five minutes. (Doc. 186-1 at 16.) Umbeck provides no evidentiary basis for this five-minute view of consumer behavior. Umbeck then identified the problems that "took more than 15 minutes to resolve." (Doc. 186-1 at 19.) (He does not explain why he ignores those problems that took between five and fifteen minutes to resolve.) Of the problems lasting fifteen minutes or more, Umbeck concludes "[m]ost of these events do not appear to stop customers from buying fuel or store items. They may not be able to pay at the pump but they can still pay in the store." (Doc. 186-1 at 20.) Neither Marathon nor Umbeck's report itself meaningfully explain how Umbeck is qualified to offer these opinions.

Umbeck's opinions based on his "analysis of the actual computer problems" cannot be admitted. Umbeck admitted he has no expertise or specialized knowledge to understand computer system issues. (Doc. 186-3 at 11 (Umbeck stating he is "definitely not" an IT expert and would not hold himself out as qualified to interpret system outage logs or related technical evidence).) And Marathon's attempt to offer Umbeck as qualified on this front is inexplicable. Without some technical understanding of the "Verifone logs" and precisely what they were reflecting, Umbeck has no basis for his alleged "analysis" of those problems.

But even assuming Umbeck were qualified to analyze computer problems, he has not explained how he has any expertise in consumer behavior and provides no basis for his assumption that a delay of less than five minutes would have no impact. Similarly, the record reveals no proper basis for Umbeck's unexplained decision to impose an arbitrary fifteen-minute cutoff for identifying potentially impactful events. Even more, Umbeck fails to conduct *any* analysis to demonstrate a connection between his fifteen-minute-or-longer problem list and Chandler Gas's fuel sales or finances. The closest he comes to

1 connecting his questionably-identified Verifone issues to financial consequences is a single reference to OPIS data showing Chandler Gas sold fuel each day between May 13, 2022 and May 16, 2022 (a period of one of his fifteen-plus-minute outages). (Doc. 186-1.) And beyond failing to tie the Verifone issues to any financial outputs, Umbeck provides zero support for the reliability of his methodology. His background alone will not overcome such an astounding failure. *See United States v. Valencia-Lopez*, 971 F.3d 891, 898–900 (9th Cir. 2020).

Finally, Umbeck seems to expect the court and factfinders to draw meaningful conclusions from a chart containing gross fuel sales revenue, C-store revenue, and total sales revenue. (Doc. 186-1 at 14.) Umbeck presents a chart with these figures and blankly states "the table shows no significant decline in revenues from fuel sales or store sales." (Doc. 186-1 at 15.) Yet there is zero explanation or analysis to show why differences the chart shows in revenue should be considered insignificant. Umbeck thus provides no reliable reasoning supporting his conclusion that no significant loss of revenues occurred over the relevant time period. *Valencia-Lopez*, 971 F.3d at 898. In sum, Umbeck inadequately described his methodology, failed to show how his methodology is supported in his field and reliable, did not establish the meaning of a "significant" loss or financial harm, did not explain why his fifteen-minute Verifone threshold is appropriate, and did not tie any of his (questionably-selected) computer issues to any finances whatsoever.

For these reasons, Umbeck's Opinions 3 and 4 are excluded.

**Opinion 5 Regarding Customer Reviews**

Umbeck obtained 36 customer reviews through Google Maps from the relevant period and concludes there is no evidence of customers being upset about the computer problems, and thus "no evidence of a significant loss of business . . . due to the alleged computer problems." (Doc. 186-1 at 21–22.) Umbeck's discussion of the customer reviews is unusually scant and confusing. He says that clicking on the station on Google Maps "open[s] up a website with all kinds of information about the station, including the

experiences of customers who like to leave comments and reviews about the visit." (Doc. 186-1 at 21–22.) It is unclear whether this "website" is Google Maps or another platform. Rather than select comments exclusively from the relevant period, Umbeck includes reviews from 2021 to 2023 to "see the comments." (Doc. 186-1 at 22.) He offers no real explanation why he chose a broader period. He requests the court read through the reviews in the appendix of his report to see "very positive" and "not positive" descriptions of things. (Doc. 186-1 at 22.) He notes that in the 36 reviews he obtained, there was not one comment mentioning computer problems or clerks being on the phone to report computer issues. (Doc. 186-1 at 22.) From these facts alone, Umbeck concludes the customer complaints provide "no evidence of a significant loss of business at [Chandler Gas] due to the alleged computer problems." (Doc. 186-1 at 22.)

This conclusion by Umbeck does not meet the *Daubert* standard. Even assuming the accuracy of the customer reviews themselves, Umbeck provides no reliable method for extrapolating economic harm from qualitative anecdotal feedback. His methodology appears to have consisted of reading through a relatively arbitrary collection of consumer reviews of Chandler Gas, and nothing more. There is no part of Umbeck's background that qualifies him to conduct a qualitative analysis of customer reviews retrieved through his own unexplained research on Google Maps. *See Hankey*, 203 F.3d 1160, 1168–69 (9th Cir. 2000); *see also 11333 Inc.*, 261 F. Supp. 3d at 1027. Even if his background demonstrated expertise to conduct such a qualitative analysis, Umbeck does nothing to tie these consumer reviews to any impacts on the business of Chandler Gas. Umbeck also fails to consider other resources that could provide a fuller picture of customer sentiment (Doc. 186 at 14) and ultimately provides no reason why his methodology is sound or proper.

For these reasons, Opinion 5 is excluded.

**Opinion 6**

Opinion 6 relies entirely on excluded Opinions 3 through 5, and therefore depends on unreliable and inadmissible testimony. Although inadmissible evidence may be

considered in formulating expert opinions, Fed. R. Evid. 703, Umbeck may not rely on evidence that itself is unreliable. *See Daubert*, 509 U.S. at 589; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Here, Umbeck's conclusion depends substantially on Opinions 3-5, which have been excluded as methodologically unreliable. Because the foundation for Opinion 6 is unreliable and that opinion is otherwise broad and unsupported by independent valuation methodology, it is excluded.

### Opinion 7 Regarding the Causation of Lost Profits

Umbeck's Opinion 7 concludes that any decrease in fuel sales volume during the relevant period was caused by Chandler Gas's pricing decisions and not the alleged operating system failures. (Doc. 186-1 at 35.) Chandler Gas argues this opinion—which is based primarily on price differentials between Chandler Gas and the nearby Circle K station—should be excluded because it is "flawed and unreliable" and prejudicial. (Doc. 186 at 19.)

To provide support for Opinion 7, Umbeck uses data on the station's average monthly retail prices before, during, and after Chandler Gas's ownership. (Doc. 186-1 at 23.) Umbeck first compares Chandler Gas's prices with those of its eight closest competitors, which seems to show nearly identical pricing between 2018 and 2024. (Doc. 186-1 at 23.) But then Umbeck provides stronger support for his conclusions. He demonstrates a gradual decline in monthly average gasoline sales for Chandler Gas (Doc. 186-1 at 25) and a gradual increase in the differential between the retail price offered by Chandler Gas and the wholesale price at which it purchased the gasoline (Doc. 186-1 at 28). Finally, Umbeck compares the monthly price of Chandler Gas with a competitor Circle K station just under one mile away. (Doc. 186-1 at 30.) Umbeck's data shows that Chandler Gas's average monthly retail price was often a few cents below Circle K's price for the last half of 2021, but several cents higher than Circle K's in 2022 (and even up to more than fifteen cents higher in November 2022). (Doc. 186-1 at 30.) In the same chart, Umbeck also shows a mostly-gradual decline in the average monthly volume of gasoline sold by Chandler Gas. (Doc. 186-1 at 30.)

From this data, Umbeck concludes the retail prices set by Chandler Gas—and not the computer problems—caused the volume of gasoline sales to drop. (*See* Doc. 186-1 at 31, 35.) This testimony is relevant to causation and damages because it offers an alternative explanation for the decline in sales volume, which is a key contested issue in the case. Expert testimony that helps the jury evaluate competing causal explanations for damages claims is within the scope of Rule 702. *See Hangarter*, 373 F.3d at 1016. The methodology employed by Umbeck is also sufficiently reliable. Economic experts like Umbeck may rely on historical price data and market comparisons to form opinions about the effect of pricing on sales. Here, Umbeck presents data showing evidence of patterns between price changes and volume shifts. Since the analysis is informed by Umbeck's background as an economist and relevant experience within the petroleum industry, it sufficiently satisfies the *Daubert* standard. *Primiano*, 598 F.3d at 564. Though Umbeck's causal conclusion regarding lost fuel sales is sweeping, the court does not find the analytical gap between the data and opinion proffered "too great." *See Gen. Elec.*, 522 U.S. at 146. Any weaknesses in the scope of the comparative analysis or the inference drawn by Umbeck in Opinion 7 may be addressed through cross-examination.

Accordingly, the motion to exclude Opinion 7 is denied.

**Opinion 8 Regarding Plaintiffs Having Caused All Loss in Value**

Umbeck's Opinion 8 states that "any loss in value the business might have incurred during this time period was caused by the plaintiffs." (Doc. 186-1 at 9.) Unlike Umbeck's pricing analysis in Opinion 7, Umbeck does not identify a valuation methodology or provide an evidentiary basis for this opinion. Umbeck does not perform a discounted cash flow analysis, comparable sales analysis, or any other recognized valuation technique. Nor does he provide an economic model linking the alleged causes (*e.g.*, pricing decisions) to any measurable diminution in business value. In fact, Umbeck's report includes essentially no discussion or reasoning to support this opinion: there is not a single sentence about the business value or how Chandler Gas may have caused any loss in value. This opinion is too unreliable to satisfy the necessary standard

because it does not have an adequate analytical or methodological basis. *See Gen. Elec.*, 522 U.S. at 146 (holding courts may exclude expert testimony supported only by ipse dixit).

Accordingly, Opinion 8 is excluded.

**Rebuttal Report**

Chandler Gas also objects to portions of Umbeck's rebuttal report, arguing Umbeck impermissibly exceeds the scope of proper rebuttal. (Doc. 186 at 20–21.) Rebuttal testimony must be "intended solely to contradict or rebut evidence on the same subject matter identified by another party's expert." Fed. R. Civ. P. 26(a)(2)(D)(ii); *see also Daly v. Fesco Agencies NA Inc.*, 108 F. App'x 476, 480 (9th Cir. 2004). Expert rebuttal may respond to, analyze, or critique the opinions of an opposing expert, but it may not be used to advance new arguments, theories, or analyses that should have been disclosed in the rebutting expert's original report. *See Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 896 (S.D. Cal. 2019) ("[r]ebuttal testimony cannot be used to advance new arguments or new evidence") (internal quotation marks omitted). Accordingly, Umbeck will be permitted to offer rebuttal testimony only to the extent it directly responds to or contradicts McDevitt's opinions. *See Puente v. City of Phoenix*, No. CV-18-02778-PHX-JJT, 2021 WL 1209302, at *2 (D. Ariz. Mar. 31, 2021) (applying Fed. R. Civ. P. 26(a)(2)(D)(ii)). Any testimony beyond the proper scope of rebuttal will be excluded.

### c. Conclusion

Umbeck may offer Opinions 1, 2, and 7. Opinions 3, 4, 5, 6, and 8 are excluded. To be clear, Umbeck cannot offer testimony regarding the technical functioning of the operating system, the Verifone records, or the actual cause of any system outages. Additionally, Umbeck must not offer opinions based on personal feelings or unexplained assumptions rather than reliable principles and methods. (*See, e.g.*, Doc. 186-1 at 16 ("Having experienced numerous computer problems myself, I'm sure these problems were very annoying for the individuals operating the station. However, if it can be

resolved by making a 5-minute phone call, it will probably not cause your customers to leave your station and go somewhere else for their fuel and store items.").)

### III. Marathon's Motion to Exclude McDevitt

Unlike Umbeck's opinions, McDevitt's opinions will not be addressed individually. McDevitt's six opinions are not independent conclusions on distinct topics. Rather, they are different numerical outputs of an economic damages model estimating lost profits and business value over a defined period. His methodology, assumptions, and input materials are common to all six opinions. To avoid redundancy, McDevitt's opinions are analyzed at once, with a focus on whether his qualifications, methodology, and underlying assumptions satisfy the necessary *Daubert* standard.

#### a. McDevitt's Opinions

Max McDevitt is an economist at the consulting firm, The Fontana Group, Inc., and has "assisted with" over two dozen cases related to franchisee issues, generally in the automotive industry. (Doc. 192-1 at 5.) Chandler Gas hired Fontana and McDevitt to provide relevant economic analysis for this case. (Doc. 192-1 at 6.) Specifically, McDevitt has been retained to produce an expert report estimating the lost profits for Chandler Gas between June 2021 and July 2024 and the loss of value on the sale of business assets for Chandler Gas due to the alleged point-of-sale operating system malfunctions. (Doc. 192-1 at 6–7.) McDevitt intends to introduce the following opinions at trial:

1. Chandler Gas lost an estimated 907,708 gallons of fuel sales between June 2021 and July 2024
2. Chandler Gas lost an estimated $1,731,972 in C-Store sales between June 2021 and July 2024
3. Chandler Gas lost an estimated $333,040 in fuel profits between June 2021 and July 2024
4. Chandler Gas lost an estimated $388,532 in C-Store profits between June 2021 and July 2024

5. Chandler Gas lost an estimated $721,572 in total profits (combined fuel and C-Store) between June 2021 and July 2024

6. Chandler Gas's estimated loss of value on the sale of business assets was $784,604 (Doc. 192-1 at 7.)

### b. Analysis

McDevitt is an economist with a doctorate in economics from Boston University. (Doc. 192-1 at 5.) He has experience with applied economics and statistics, especially within the retail automotive industry. (Doc. 192-1 at 20–22.) He consults and performs analyses on topics like applied econometrics, economic harm, franchise economics, and spatial sales distribution and market behavior. (Doc. 192-1 at 20–21.) As part of his work with Fontana, McDevitt has worked on cases regarding lost profits and lost sales, among other related economic topics. (Doc. 192-1 at 5.) Marathon challenges McDevitt's qualifications on the basis he lacks specialized experience in retail gasoline markets and the petroleum industry. (Doc. 192 at 1.)

McDevitt's educational background and professional experiences provide the minimal foundation required under Rule 702 for testimony regarding basic economic-damages calculations. *See Hangarter*, 373 F.3d at 1015–16. There is generally no requirement for an expert to be a specialist in a given field. *Doe v. Cutter Biological, Inc., a Div. of Miles Lab'ys, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992). An expert is qualified to offer opinions so long as he does not go beyond his knowledge and experience. *See Gorney v. Safeway Inc.*, No. CV-23-01413-PHX-SHD, 2025 WL 2586133, at *5 (D. Ariz. Sept. 8, 2025). Here, McDevitt is not going beyond his specialized field of applied economics. Though he does not appear to have extensive experience in the petroleum industry, he *does* have the necessary background to conduct damages modeling and offer opinions on lost profits, sales, and value. (*See* Doc. 192-1 at 20–21.) Any lack of specialized industry experience for McDevitt would merely go to the weight—not admissibility—of his testimony. *See Hangarter*, 373 F.3d at 1015–16; *see also United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993). Therefore, Marathon's arguments

surrounding McDevitt's qualifications fail.

Marathon also takes issue with McDevitt's methodology. Marathon argues McDevitt's damages opinions rest on biased assumptions—particularly that all lost sales were attributable to operating system glitches rather than price increases or competition. (Doc. 192 at 10.) But McDevitt's assumptions, which he makes very clear, do not stray into terrain that would preclude his testimony. He reviewed historical data, incorporated alternative pricing scenarios, and grounded his damage calculations in the station's actual financial records. *Nuveen Quality Income Municipal Fund, Inc. v. Prudential Equity Group, LLC*, 262 F. App'x 822, 824 (9th Cir. 2008) ("[a]n expert opinion is properly excluded where it relies on an assumption that is unsupported by evidence in the record and is not sufficiently founded on facts"); *cf. Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825, 830 (9th Cir. 2001) (excluding expert opinion based on insufficiently-supported assumption). And experts are allowed to rely on records created by others if they disclose their assumptions and use those records to apply their own specialized expertise. *See* Fed. R. Evid. 703; *see also Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1056 (9th Cir. 2024). Ultimately, if an assumption has a reasonable basis in the record, an economics expert like McDevitt may stretch the assumption to extremes so long as he does not veer into "unreliable nonsense." *See Unknown Party v. Arizona Bd. of Regents*, 641 F. Supp. 3d 702, 727 (D. Ariz. 2022); *see also Alaska Rent-A-Car*, 738 F.3d at 969–70 (holding that expert's reliance on assumptions affects weight, not admissibility, where methodology is otherwise sound). Since the record indicates at least some basis for McDevitt's assumptions that the operating system malfunctions resulted in declined sales and values, his testimony may be offered. Disagreements with McDevitt's assumptions and opinions are best left for cross-examination. *Marsteller v. MD Helicopter Inc.*, No. CV-14-01788-PHX-DLR, 2018 WL 3023284, at *2 (D. Ariz. May 21, 2018).

Marathon further asserts McDevitt ignored basic principles of economics like the law of demand. (Doc. 192 at 11.) In making this argument, Marathon relies on cases featuring experts whose analyses rested on assumptions contrary to basic economic

principles. *See, e.g.*, *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1359 (Fed. Cir. 2001) (court stating it would have excluded minimally-qualified expert who failed to account for price elasticity of demand). But that argument essentially restates Marathon's complaint that McDevitt failed to conduct a wholistic causation analysis incorporating the price of fuel. That McDevitt did not conduct an independent causation analysis is no basis for exclusion. A damages expert may assume liability and opine solely on the amount of damages. *See Calyxt Inc. v. Tri-Rotor LLC*, No. CV-20-01221-PHX-DLR, 2024 WL 2699938, at *4 (D. Ariz. May 24, 2024) (permitting expert to assume causation when providing approximate estimation of damages). An expert opinion must rest on more than speculation but need not eliminate all competing explanations, *see Stephens v. Union Pacific Railroad Co.*, 935 F.3d 852, 856 (9th Cir. 2019), and the reasonableness of the assumptions is a matter for the factfinder. Though Marathon may contend McDevitt's analyses were flawed because Chandler Gas raised its prices above competitors, this argument does not render McDevitt's testimony inadmissible. He did not rely on unsupported speculation and the fact that he did not conduct independent causation analysis is no issue.

Lastly, Marathon argues McDevitt's opinions should be excluded because the opinions would mislead the jury and cause unfair prejudice. (Doc. 192 at 8.) Under Rule 403, otherwise admissible expert testimony should be excluded if the probative value of the evidence is substantially outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. This is an extraordinary remedy in the context of otherwise-admissible expert testimony and would be inappropriate here. McDevitt's calculation of damages has probative value given the issues at hand, and any risk of prejudice or confusion can be mitigated through cross-examination, the presentation of Umbeck's competing analysis, and appropriate jury instructions. *See United States v. Pritchard*, 993 F. Supp. 2d 1203, 1213 (C.D. Cal. 2014), *aff'd*, 692 F. App'x 349 (9th Cir. 2017). The probative value of McDevitt's

testimony is not substantially outweighed by the danger of unfair prejudice, so the motion to exclude under Rule 403 is denied.

### c. Conclusion

In all, McDevitt's economic damages opinions are supported by relevant expertise, employ a methodology that is sufficiently reliable under Rule 702, and rest on an adequate factual basis. The issues Marathon raises—the validity of McDevitt's assumptions and scope of his analysis—are properly addressed through cross-examination and competing expert testimony, not through *Daubert* exclusion. Accordingly, Marathon's motion to exclude the testimony of McDevitt is denied.

Accordingly,

**IT IS ORDERED** the Motion to Exclude the Testimony of Umbeck (Doc. 186) is **GRANTED IN PART** and **DENIED IN PART**. The motion to exclude Umbeck's Opinions 3, 4, 5, 6, and 8 is **GRANTED**. The motion to exclude Umbeck's Opinions 1, 2, and 7 is **DENIED**.

**IT IS FURTHER ORDERED** the Motion to Exclude the Testimony of McDevitt (Doc. 192) is **DENIED**.

Dated this 29th day of October, 2025.

Honorable Krissa M. Lanham
United States District Judge